COATS & CLARK, INC., SUCCESSOR TO CROWN FASTENER CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 34679. Filed October 25, 1960.

*Richard P. Jackson, Esq., Foster Bam, Esq.,* and *Doris L. Bosworth, Esq.,* for the petitioner.

*William V. Crosswhite, Esq.,* for the respondent.

MULRONEY, *Judge:* Respondent disallowed the petitioner's applications for excess profits tax relief under section 722 of the Internal Revenue Code of 1939 [1] for the years 1941 through 1945. Petitioner originally based its claims for relief on section 722(b)(1), (4), and (5), but section 722(b)(1) and (5) was waived at the trial. The questions presented are:

---

[1] All section references are to the Internal Revenue Code of 1939, as amended.

(1) Whether the petitioner's business, because of purported qualifying changes in the character of its business within the meaning of section 722(b)(4), did not reach, by the end of the base period, the earnings level it would have reached if it had made such changes 2 years earlier; and

(2) Whether the petitioner has established that its excess profits tax, computed without the benefit of section 722, is excessive and discriminatory and has established a fair and just amount representing normal earnings to be used as a constructive average base period net income.

Proposed findings of fact were made by a commissioner of this Court and served upon the parties. Petitioner, with one exception, makes no objections to those findings of fact though it seeks additional findings, and respondent makes several objections to the commissioner's findings of fact and also requests additional findings. The facts as stipulated are now found, and the commissioner's findings of fact which are not objected to are now adopted for the purposes of this opinion. Where, in the following summary of our findings of fact, we relate facts objected to or requested by the parties, our inclusion of such facts will be deemed rulings on the objections or requests without specifically noting each such objection or request. For the purposes of this opinion, the pertinent facts will be summarized.

### FINDINGS OF FACT.

Crown Fastener Corporation, hereinafter referred to as Crown, was incorporated under the laws of Delaware on May 23, 1934, and has its principal office and place of business in Warren, Rhode Island. Coats & Clark, Inc., by merger, is now the successor to Crown.

Crown kept its books and filed its Federal income tax returns under the accrual method of accounting on a calendar year basis for the years here involved. Crown filed its income, declared value, and excess profits tax returns for the years 1940 through 1945 with the then collector of internal revenue for the district of Rhode Island at Providence, Rhode Island.

Crown's excess profits tax liability for each of the years 1941 through 1944, as finally determined by respondent without the application of section 722, was as follows:

| Calendar year | Excess profits tax liability |
|---|---|
| 1941 | $43,195.01 |
| 1942 | 236,633.15 |
| 1943 | 520,850.46 |
| 1944 | [1] 491,027.26 |

[1] After giving effect to net operating loss carryback from the calendar year 1946 in the amount of $609,305.47; and an unused excess profits credit carryback from the calendar year 1946 of $237,471.61. Form 1139, Application for Tentative Carry-back Adjustment, was filed for the calendar year 1944 on Mar. 11, 1947.

All of the foregoing taxes have been paid by Crown.

Crown was in existence during the entire base period, 1936 through 1939, and was entitled to use an excess profits credit based on income, computed under section 713. Inasmuch as its excess profits credit based on invested capital, computed under section 714 exceeded the credit computed under section 713 for each of the excess profits tax years 1941 through 1944, Crown used the invested capital method in computing its excess profits tax liability. The credits computed under sections 714 and 713 were as follows:

| Calendar year | Credit under sec. 714 | Credit under sec. 713 |
|---|---|---|
| 1940 | $159,200.00 | $92,507.14 |
| 1941 | 168,141.54 | 108,443.98 |
| 1942 | 179,674.27 | 108,443.98 |
| 1943 | 182,392.95 | 108,443.98 |
| 1944 | 196,708.85 | 108,443.98 |
| 1945 | 222,005.69 | 108,443.98 |
| 1946 | 237,471.61 | |

Crown's actual base period net income under the 1940 and 1941 laws was as follows:

| Calendar year | 1940 law | 1941 law |
|---|---|---|
| 1936 | ($76,266.47) | ($76,266.47) |
| 1937 | (47,830.08) | (47,830.08) |
| 1938 | 16,077.72 | 18,607.81 |
| 1939 | 97,375.94 | 114,151.56 |
| Aggregate | (10,642.89) | 8,662.82 |

Crown's average base period net income for the excess profits tax years 1940, 1941, and 1942 to 1945, inclusive, computed with the benefits of section 713(f) and section 713(e)(1), was as follows:

| Year | Sec. 713(f) | Sec. 713(e)(1) |
|---|---|---|
| 1940 | $97,375.94 | $16,405.90 |
| 1941 | 114,151.56 | 21,232.32 |
| 1942–1945 | 114,151.56 | 26,540.40 |

Crown was incorporated on May 23, 1934, at the instance of Elisha Walker, the managing partner of the investment banking firm of Kuhn, Loeb & Company, New York, New York, for the purpose of manufacturing slide fasteners or "zippers" by the die-cast method. This method of manufacturing slide fasteners was the outgrowth of the inventions and patents of Louis H. Morin and his father, David Marinsky. Walker and his associates were the original stockholders of Crown with Morin and Marinsky purchasing a small amount of the stock.

After Crown was organized, Whitehall Patent Corporation, a patent holding company formed by Morin and Marinsky to which they transferred their zipper patents and developments, including the application for the patent on the diecasting machine, licensed it under the aforementioned zipper patents and zipper patent applications, including the patent application on the diecasting machine. Under the licensing agreement Whitehall was to receive a royalty of $200,000, plus a fixed amount per zipper. After Coats & Clark, Inc., obtained control of Crown, the royalty was modified to a percentage basis instead of a fixed amount per zipper.

Upon starting operations in 1934, Crown retained Morin and Marinsky as consultants on a yearly retainer basis, which arrangement was in effect throughout the base period. During these years Marinsky and Morin continued their experimental and development work on zippers and zipper parts.

Crown was the only manufacturer of zippers that used the die-cast method. In manufacturing its zippers, Crown heated a zinc alloy until it was molten (825 degrees Fahrenheit) and then forced the molten metal into a die that closed around the tape. The dies were cooled so that the heat of the molten metal was dissipated without burning, discoloring, or weakening the tape. This method of casting the scoops (the teeth which mesh together to effect the closure) directly on the tape enabled the metal to penetrate into the tape fabric and anchor the scoops securely.

Crown's operations for calendar year 1935 showed the following results: Gross sales, $48,535.63; net sales, $42,743.96, but after an adjustment of returns and allowances by a revenue agent, net sales of $42,121.57; gross profit, $6,077.32; and a loss of $30,633.22.

In the summer of 1936 the Coats & Clark organization, hereinafter described, became interested in Crown and its method of manufacturing zippers by diecasting. John B. Clark, president, and Frank B. Hutton, treasurer, of J. & P. Coats (R.I.) Inc., one of the constituent companies of the Coats & Clark group, negotiated with Elisha Walker, who, together with his family, controlled Crown.

The purchase of control of Crown was effected on or about August 19, 1936. As a result of meetings of Crown's directors held on August 19 and 20, 1936, the Coats & Clark organization caused its representatives to be elected so as to constitute a majority of the board of directors. By virtue of action taken at the directors meeting of August 20, 1936, the Coats & Clark directors caused its representatives to be elected as the chief executive officers of Crown.

Prior to and during the base period, J. & P. Coats (R.I.) Inc. was one of a group of 10 American companies, exclusive of Crown, controlled by J. & P. Coats, Ltd., of Glasgow, Scotland, one of the largest,

if not the largest, thread-manufacturing company in the world. These American companies, together with the parent, will hereinafter sometimes be called the Coats & Clark organization. The chief executive and operating officer of each of the American companies was John B. Clark. The American companies were managed as autonomous companies. For liaison purposes, Clark was a director of the parent company, J. & P. Coats, Ltd. Five of the American companies were manufacturers, two were importers with one a manufacturer as well, two sold the products manufactured and imported, and one owned trademarks but was a non-operating company.

The Coats & Clark companies were closely associated and operated as a unit. Their affairs were managed by a joint committee made up of the American directors of all companies. In the day-to-day operations of the various companies, including Crown, they were considered as one operating concern divided into four divisions: (1) Finance and Control Division (which in turn was subdivided into (a) Finance, (b) Control, and (c) Central Production and Planning); (2) Manufacturing Division, which was in charge of manufacturing operations; (3) Merchandising Division, which acted as liaison between manufacturing and sales, and which had under its authority the production and designing of new articles, the designing of packaging boxes, etc.; and (4) Sales Division. All four of the divisions came under the jurisdiction of John B. Clark, the chief executive officer of the United States companies.

Among the Coats & Clark companies was Spool Cotton Company organized in 1898, hereinafter referred to as Spool Cotton. It acted as factor and sales agent for products manufactured by the other Coats & Clark companies in the United States. It sold thread and other notions to (1) manufacturers who used such articles in producing their own products, referred to herein as "industrial sales," and (2) chain stores and other retail outlets, referred to herein as "domestic sales." Spool Cotton had specialized knowledge and experience in both the industrial and domestic sales markets. It had had long experience in the distribution and sale of small articles to retail outlets selling notions. It sold articles bearing the Coats & Clark trademark and had built a reputation over the years for high quality merchandise. At all times material hereto, Spool Cotton's activities covered the United States from Maine to California. It divided the country into various sales districts and employed several hundred people in carrying on its activities, having 618 employees in January 1937 and 808 in December 1939. Spool Cotton maintained 11 depots or warehouses throughout the country where it kept stocks of the Coats & Clark products that it sold. The depots were a very signifi-

cant key element in the distribution facilities of Spool Cotton during the base period.

Over the years Spool Cotton had built up a great deal of goodwill with its customers because of its prompt delivery service. Customers relied on this practice because it permitted them to operate with a smaller investment in inventory since they knew they could always get fast service from the Coats & Clark depots.

On or about August 21, 1936, after management and control of Crown had passed to directors representing Coats & Clark, Crown appointed Spool Cotton as the sole selling agent of its products. For its services, Spool Cotton received commissions as follows:

From the date of purchase until the end of 1936, 8½ per cent of net sales plus a charge for office space.

During 1937, 8½ per cent of net sales plus a charge of $2,040 for office space.

For the period 1938 through 1943, 10 per cent of net sales plus an additional 3½ per cent of such net sales made through depots.

In 1936, when it began selling Crown's products, Spool Cotton used its regular salesmen to handle such sales (it acquired not more than two salesmen from Crown). It was common practice whenever a new article was introduced, that certain salesmen of Spool Cotton would be instructed specially on the best methods to follow in promoting the sale of the new article, in this instance, zippers.

Crown started operations in a small plant in the Bronx having approximately 4,000 square feet. In July 1936 Crown recognized that it would have to have more floor space, and on or about October 13, 1936, moved its plant from the Bronx to Warren, Rhode Island. The plant at Warren was much larger covering a total area of 92,740 square feet, exclusive of storage sheds.

In July 1936 Crown had 10 chain-casting machines in its plant in the Bronx and had other machines on order. During each of the base period years Crown added new chain-casting machines as follows: 21 in 1936, 10 in 1937, 22 in 1938, and 15 in 1939. The new machines were metal-casting machines, except the 10 added in 1937, which were acetate-casting machines used for manufacturing plastic zippers. Twenty of the machines added in 1938 were ordered in September 1937. During 1940 and 1941, Crown added 10 more metal-casting machines, 4 in 1940 and 6 in 1941. By the end of 1939, practically all of Crown's machines had been converted to or were new compressed air machines.

Prior to April 12, 1937, Clark became dissatisfied with the operating efficiency of the chain-casting machines at Warren. He went to Warren and together with Lohse made a study of the operational difficulties at the plant. At that time the plant was operating on a 1-shift-per-day basis, and was losing a considerable amount of time

each morning in melting the zinc so that the day's operations could start. On or about April 12, 1937, management, at Lohse's suggestion, placed the chain-casting machines on a 3-shift, 24-hour-per-day, 5-day-a-week schedule. On or about October 29, 1937, management increased Crown's operations to a full 7-day-a-week basis and thereafter maintained such schedule for all times material hereto.

After Coats & Clark acquired control and management of Crown, Morin and Marinsky continued to be retained at all times material hereto to conduct experimental and development work. They operated in association with the Gries Machine Company of New York City which continued to build the machines ordered and used by Crown in its plant at Warren. Patents granted to Morin or Marinsky were assigned to Whitehall Patent Corporation, which licensed Crown thereunder.

The base period was a period of constant change and development in Crown's manufacturing techniques. Having adopted a different method of manufacturing zippers from its competitors, Crown had to learn by trial and error how to surmount the various problems it encountered. Technological changes were occurring during this same time in the slide fastener industry generally, so that Crown's experience though more intensive was not unusual. Changes in its operations during the base period increased Crown's manufacturing capacity and enabled it to sell zippers in markets which it could not otherwise serve. In many instances, United States patents were granted for inventions that were developed in improving Crown's manufacturing techniques.

During and immediately prior to the base period, Crown made the following changes and improvements: (1) Improved the method of melting metal; (2) use of new special metal alloys in its diecasting machines; (3) increase in the efficiency of the diecasting machines by an improvement in design of the "gooseneck," one of the parts; (4) purchase of a German machine which permitted unskilled labor to cut efficient dies; (5) development of a method of plating and enameling zippers; (6) solved difficulties involving the tapes; (7) simplified the method of diecasting the slider in the zipper; (8) developed an automatic locking device; (9) designed a machine to cast and trim zipper parts in a single operation and (10) increased the rate of machine operation by using compressed air as a means of operation.

After Crown moved its plant to Warren it materially increased the number of its employees. On February 1, 1937, it had 160 employees. During February 1937, and each month thereafter through December 1941, Crown was hiring and losing employees. Crown's employees at the end of each calendar quarter from March 31, 1937, through December 31, 1941, were as follows:

| Quarter ending— | Number of employees | Quarter ending— | Number o, employees |
|---|---|---|---|
| Mar. 31, 1937 | 172 | Sept. 30, 1939 | 805 |
| June 30, 1937 | 208 | Dec. 31, 1939 | 889 |
| Sept. 30, 1937 | 236 | Mar. 31, 1940 | 905 |
| Dec. 31, 1937 | 326 | June 30, 1940 | 902 |
| Mar. 31, 1938 | 368 | Sept. 30, 1940 | 952 |
| June 30, 1938 | 553 | Dec. 31, 1940 | 954 |
| Sept. 30, 1938 | 700 | Mar. 31, 1941 | 938 |
| Dec. 31, 1938 | 771 | June 30, 1941 | 975 |
| Mar. 31, 1939 | 660 | Sept. 30, 1941 | 788 |
| June 30, 1939 | 717 | Dec. 31, 1941 | 698 |

The largest increase in Crown's labor force occurred in June 1938 and August 1938. In June, 110 new employees were hired and 7 left for a net increase of 103. In August 128 new employees were hired and 24 left for a net increase of 104.

During the base period, Crown increased its equity capital from $150,870 in July 1936 to $1,990,000 at December 31, 1939. Each increase in equity capital was accomplished by the issuance of rights to the common stockholders, in accordance with their preemptive rights, permitting them to acquire, as the case might be: (a) Additional shares of common stock, or (b) shares of $9 par voting preferred stock, or (c) in 1939, shares of a new $10 par convertible second preferred stock.

Late in 1939, Crown employed Rath & Strong, a firm of management consultants previously used by the Coats & Clark organization, to make a study of its operations and wage incentive rates at Warren. The study was to cover the application and the effectiveness of incentive rates, problems of production, and problems of quality of merchandise.

The Rath & Strong survey was completed and a written report thereon was prepared late in November 1939. Prior to submitting the written report, and on or about November 27, 1939, Strong and Harlow presented their findings orally to Clark and Hutton. Subsequently, and under date of December 21, 1939, their written report was submitted. This report, 44 pages in length, criticized various operations at the Warren plant, pointed out undesirable practices and procedures, and recommended 32 changes to assist the management of Crown in solving its problems. The survey and the recommendations dealt principally with the rate setting, inspection, and casting departments, process and product changes, supervision, and management.

After Strong and Harlow made their verbal report, Rath & Strong was retained to assist Crown's management in making effective their recommendations. On December 19, 1939, Clarence Gray, an employee of Rath & Strong, went to the Warren plant to start this work. Gray was to go through the plant from one end to the other and establish proper incentive rates on every job in the plant, to assist in setting proper incentive rates, to help management train the supervisory staff in the fundamentals of good incentives, to help the whole organization

to set up proper controls, and to develop better processes for inspection for quality control of zippers similar to the highest standards of quality maintained by Coats & Clark. Gray was assisted in this work by Frederick Hornbruch, another Rath & Strong employee. Gray worked at the Warren plant on full time until about the middle of 1940, and for a year thereafter on a part-time basis. Strong visited the plant about once a week during the first 6 months and about twice a month during the succeeding year.

Crown accepted most of the Rath & Strong recommendations but at least four of them were not adopted. Some of the recommendations accepted were routine and would have applied to most manufacturing establishments; some were applicable specially to Crown. When these recommendations became effective, the Warren plant became a more efficient operating plant and production increased. The establishment of proper wage incentive rates brought out defects on the part of management that caused delays and improved employee relationships since the employee was no longer charged with "down time" for factors over which he had no control.

In its 1937 industrial sales report, Crown referred to its recently inaugurated stock service plan which permitted it to concentrate on items used by certain industries, namely, work shirts, handbags and other lightweight leather goods, dress trade, housecoats, polo shirts, ladies' suits, radiator covers, garment bags, rubber overshoes, suede, woolen, and leather jackets (separators). During 1938, Crown experienced "quite some difficulty" in getting the mail-order houses to anticipate their needs so it could build up the necessary stocks. Lack of experience by the mill, merchandise, and sales departments to properly plan production was also charged with affecting sales and with the carryover in stock.

Crown continued to have difficulty in 1939 in putting its service stock plan into operation. During the first quarter, it prepared large quantities of separating zippers in anticipation of mail-order requirements and to some extent service stock items. Because of mail-order and domestic line requirements, Crown reported that "it was not possible to build up our regular Service Stock items to the point that would permit us to do a proper servicing job."

It was 1940 before Crown was able to operate fully its service stock plan. Under this plan minimum stocks of zippers for specific end uses were maintained for each style, length, color, and finish, so that the sales department was in a position to ship immediately upon receipt of an order. Prior thereto, Crown obtained an order from a customer, manufactured the zippers specifically for that customer, and then shipped the zippers to him. This procedure resulted in delays in servicing customers, particularly when orders piled up, and in overruns and underruns of the customer's order by the mill. The

manufacturer's ability to make quick deliveries was important to industries subject to seasonal demand and rapid style changes.

Prior to 1938 Crown was selling its zippers in the industrial markets and making plans to enter the retail or domestic markets. On December 14, 1937, Crown's executive committee set May 1, 1938, or sooner if possible, as the date for release of the retail line. On April 25, 1938, Crown's executive committee set July 1, 1938, as the offering date of its retail lines. A price policy for the various classes of trade, including mail-order houses was tentatively approved, subject to later review by the executive committee.

Crown's service stock on hand at July 1, 1938, amounted to approximately 3 million zippers consisting of 1 million industrial service stock, 250,000 domestic service stock, 1,500,000 supplementary stock, and 250,000 broken-lot stock. On August 25, 1938, all of the 701 items required to be placed in stock for service of the domestic trade were actually in stock with the exception of 21. During the remainder of the base period and through June 1940, Crown's domestic service stock increased steadily as shown by the following table, which also shows the percentage that domestic stock was of total stock:

DOMESTIC STOCK

| As of— | Zippers | Percentage of total |
|---|---|---|
| June 30, 1938 | 250,000 | 8.3 |
| July 30, 1938 | 393,000 | 11.0 |
| Sept. 3, 1938 | 686,325 | 15.0 |
| Oct. 1, 1938 | 646,060 | 16.5 |
| Oct. 29, 1938 | 710,699 | 16.5 |
| Nov. 26, 1938 | 894,335 | 19.0 |
| Dec. 31, 1938 | 1,285,465 | 24.0 |
| Jan. 28, 1939 | 1,393,678 | 24.0 |
| July 29, 1939 | 2,421,832 | 38.0 |
| Sept. 2, 1939 | 2,562,821 | 36.0 |
| Sept. 30, 1939 | 2,643,679 | 35.5 |
| Oct. 28, 1939 | 2,600,656 | 35.0 |
| Nov. 25, 1939 | 2,760,424 | 34.7 |
| Dec. 30, 1939 | 2,886,486 | 33.0 |
| Feb. 24, 1940 | 2,679,706 | 29.0 |
| Mar. 30, 1940 | 2,566,513 | 27.0 |
| April 27, 1940 | 2,463,404 | 25.0 |
| May 25, 1940 | 2,454,626 | 25.0 |
| June 29, 1940 | 2,370,042 | 24.0 |

Although the initial release of Crown zippers to the domestic trade was planned for July 1, 1938, this release date was postponed again until on or about August 29, 1938, when most of the 701 items required to service the domestic trade were in stock. The initial offering of the Crown zipper line to the domestic trade occurred in the New York sales district and was gradually extended to other districts. At the date of release and during the base period, 60 per cent of the zipper sales by domestic or United States manufacturers was in metropolitan New York.

The first sales of Crown zippers to the domestic trade occurred in July 1938 when sales were a little over $5,000. For the last half of

1938, domestic sales of Crown zippers totaled $72,833.95. Total net sales of Crown zippers, industrial and domestic, for 1938 were $917,452.73.

Sales of Crown zippers to the industrial and domestic trade by units, regardless of style, length, color, and finish, and the total thereof for the years 1935 through 1941 were as follows:

| Year | Industrial | Domestic | Total |
|------|-----------:|---------:|------:|
| 1935 | [1] 427,440 | | 427,440 |
| 1936 | [1] 909,740 | | 909,740 |
| 1937 | 2,707,000 | | 2,707,000 |
| 1938 | 6,810,000 | 457,923 | 7,267,923 |
| 1939 | 8,031,000 | 3,235,534 | 11,266,534 |
| 1940 | 14,613,000 | 4,936,534 | 19,549,534 |
| 1941 | 20,379,000 | 8,700,362 | 29,079,362 |

[1] Derived from sales at 10 cents per unit.

Crown's service stock on hand at July 1, 1938, included approximately 1 million industrial service stock zippers, which, together with supplementary and broken-lot stocks, amounted to 2,750,000 zippers. By the end of July 1938 this total had increased to 3,196,000 and to 3,700,700 by the end of August. These increases in industrial service stocks occurred despite reduced production and operation of chain machines at 20 to 40 per cent below capacity. Crown's industrial service stocks, which include supplementary, broken-lot and mail-order stocks, increased from June 30, 1938, as set forth in the table below. Metal chain-casting machines available and chain-casting machines used for No. 4 and No. 5 chain only, using last week of each month, were as follows:

| Stock, end of— | Industrial service stock | Chain service stock | Total service stock [1] | Chain machines | |
|----------------|------------:|------------:|------------:|----------:|------:|
| | | | | Available | Used |
| *1938* | | | | | |
| June | 2,750,000 | | 3,000,000 | 53 | 52 |
| July | 3,196,000 | | 3,589,000 | 53 | 32 |
| Aug | 3,700,700 | | 4,387,025 | 53 | 40 |
| Sept | 3,751,572 | | 4,397,632 | 53 | None |
| Oct | 3,592,667 | | 4,303,366 | 53 | 51 |
| Nov | 3,741,654 | | 4,635,989 | 53 | 52 |
| Dec | 4,107,411 | | 5,392,876 | 53 | 52 |
| *1939* | | | | | |
| Jan | 3,996,516 | 445,305 | 5,835,499 | 53 | 52 |
| July | 3,597,228 | 389,805 | 6,408,865 | 68 | 57.7 |
| Aug | 4,060,101 | 405,019 | 7,027,941 | 68 | 40.5 |
| Sept | 4,399,026 | 398,270 | 7,440,975 | 68 | 67 |
| Oct | 4,669,282 | 391,132 | 7,661,070 | 68 | 70.5 |
| Nov | 4,756,642 | 422,237 | 7,939,303 | 68 | 40.5 |
| Dec | 5,383,954 | 513,348 | 8,783,788 | 68 | 40.0 |
| *1940* | | | | | |
| Feb | 6,195,495 | 398,191 | 9,273,392 | 68 | 42 |
| Mar | 6,488,634 | 376,125 | 9,431,272 | 68 | 42 |
| Apr | 6,834,846 | 438,436 | 9,736,686 | 68 | 37 |
| May | 6,835,522 | 452,030 | 9,742,178 | 68 | 47 |
| June | 7,004,892 | 442,127 | 9,817,061 | 68 | 45 |

[1] Includes domestic service stocks.

For the 3 weeks preceding the last week ending in September 1938, the metal chain-casting machines in use were 44.75, 45, and 44.88. For 2 weeks before and 2 weeks after the last week in October 1939 the chain status reports indicate that more machines were in use than were available for use. There is no explanation of this discrepancy.

From time to time during the base period Talon, Inc., hereinafter referred to as Talon, reduced its prices and Crown likewise reduced prices to meet this competition. Late in 1937, for example, there was a general reduction in zipper prices by both companies. In November 1938 there was another general reduction in prices by Talon varying from 6 to 10 per cent, which Crown met. At the end of 1939 and early in 1940 there was a further reduction approximating 5 per cent in Crown's industrial prices.

During the base period the prices of Crown's domestic zippers were reduced, the reduction to retailers and jobbers occurring on or about November 1, 1938, and the reduction to chain stores occurring on or about March 15, 1939.

In addition to reducing its prices during these years, Crown supplied other benefits to its customers in order to hold them. Such benefits, in addition to different discounts, included cabinets and trays, displays, prepaid freight, kickbacks in the case of Montgomery Ward & Co. and Sears Roebuck & Co, sacrifice sale of obsolete items, and outright grants in the case of one foreign account.

During the period 1928 to 1941, inclusive, the zipper industry sold the following numbers of zippers without regard to the length thereof:

| Year | Units (000) | Year | Units (000) |
|------|-------------|------|-------------|
| 1928 | 13, 300 | 1935 | 111, 500 |
| 1929 | 24, 000 | 1936 | 117, 900 |
| 1930 | 30, 000 | 1937 | 139, 500 |
| 1931 | 31, 500 | 1938 | 202, 000 |
| 1932 | 26, 700 | 1939 | 300, 000 |
| 1933 | 36, 200 | 1940 | 357, 000 |
| 1934 | 68, 400 | 1941 | 510, 000 |

During the period 1936 to 1941 the industry's industrial sales ranged between 93 and 95 per cent of its total sales. In 1934 and 1935 Talon supplied about 90 per cent of these industrial sales, even though various competitors had appeared including the G. E. Prentice Manufacturing Co. in 1926, the United States Rubber Co. in 1928, Waldes-Kohinoor, Inc., in 1933, Crown in 1934, Conmar Products Corporation in 1935, and others at various times. Most of these firms competed in the industrial markets, so that in 1937, when Crown was planning to enter the domestic markets, its management estimated that Talon accounted for about 95 per cent of the retail or domestic sales. By

the end of the base period a number of new firms had entered the zipper field.

By 1931 and 1932 the zipper industry was experiencing important competition from foreign made zippers. During 1932, Talon complained to the United States Tariff Commission of unfair methods of competition from these imports and secured a temporary exclusion order which was made permanent in 1934 based upon certain patents of Talon. Shortly after the exclusion order became permanent, two of Talon's most important patents expired, so that the patent rights, upon which the exclusion order was based, no longer afforded Talon protection. Thereafter, and in 1935, the importation of foreign made zippers increased noticeably and amounted to 12,992,573 units valued at $462,829. The industry appealed to the Tariff Commission and secured an increase from 45 to 66 per cent ad valorem in the tariff rate on zippers and parts thereof, effective July 31, 1936. The increase in duty had a small effect on imports from Czechoslovakia but had practically no effect on imports from Japan, the principal competing country, which supplied 55 per cent of the units imported in 1935. The Japanese and Czechoslovakian zippers competed with American zippers primarily in the industrial markets, although some Japanese fasteners appeared in retail stores.

Prior to February 6, 1937, Talon instituted suit, and on or about that date obtained an injunction, later made permanent, against Japanese importers of zippers because of infringements of Talon's patents, one of the infringements being on the separating fastener for which Talon had also licensed Crown. Sales of separable zippers were important since they were for the industrial markets and were increasing during the years 1939, 1940, and 1941. As a result of these efforts, Talon was able to license and limit Japanese imports to a quota of 36 million separable zippers of an average length of 6.8 inches until December 31, 1939, and thereafter the quota for each year was to be 18 per cent of the total number of zippers, including all imports, sold within the United States during the preceding calendar year. This action by Talon benefited Talon and the entire industry.

During the period 1936 to 1941, inclusive, the number of zipper units imported into the United States by country of origin was as follows:

| Year | Czechoslovakia | Japan | Philippines | Others | Total |
|------|----------------|-------|-------------|--------|-------|
| 1936 | 3, 470, 815 | 27, 976, 872 | | 1, 480, 684 | 32, 928, 371 |
| 1937 | 6, 654, 611 | 32, 009, 368 | 299, 448 | 527, 352 | 39, 490, 779 |
| 1938 | 2, 702, 505 | 39, 006, 026 | 1, 800, 820 | 219, 456 | 43, 728, 807 |
| 1939 | 242, 386 | 28, 654, 103 | 3, 316, 060 | 136, 671 | 32, 349, 220 |
| 1940 | | 26, 753, 522 | 4, 184, 348 | 1, 561, 776 | 32, 499, 646 |
| 1941 | 7, 200 | [1]18, 472, 651 | 1, 122, 600 | 4, 325, 650 | 23, 928, 101 |

[1] Commercial relations with Japan were broken in the summer of 1941.

The percentage of total imports to total sales in the United States and the percentage of Japanese imports to such total sales for the years 1936 to 1941, inclusive, based on unit sales, were as follows:

| Year | Percentage of total imports of total U.S. sales | Percentage of Japanese imports of total U.S. sales |
|---|---|---|
| 1936 | 27.9 | 23.7 |
| 1937 | 28.3 | 22.9 |
| 1938 | 21.6 | 19.3 |
| 1939 | 10.7 | 9.6 |
| 1940 | 9.1 | 7.5 |
| 1941 | 4.7 | 3.6 |

The unit value of all zippers imported into this country and of Japanese and Czechoslovakian zippers for the years 1936 to 1941, inclusive, was as follows:

UNIT VALUE OF ZIPPERS
(Cents)

| Year | All imports | Japanese | Czechoslovakian |
|---|---|---|---|
| 1936 | 2.4 | 2.1 | 4.0 |
| 1937 | 2.2 | 1.9 | 3.4 |
| 1938 | 2.1 | 1.9 | 3.3 |
| 1939 | 2.2 | 2.0 | 3.3 |
| 1940 | 2.1 | 2.0 | None |
| 1941 | 2.1 | 2.0 | 4.1 |

The combined net sales, as reported by eight zipper manufacturers on their income tax returns for the base period years, in rounded figures, and the total value of all imports into this country during the years 1936 to 1941, inclusive, were as follows:

| Year | Combined net sales | Total value all imports | Percentage Col. 2 of Col. 1 |
|---|---|---|---|
| 1936 | $13,282,000 | $781,671 | 5.885 |
| 1937 | 17,879,000 | 869,829 | 4.865 |
| 1938 | 22,119,000 | 902,444 | 4.079 |
| 1939 | 29,510,000 | 695,906 | 2.359 |
| 1940 | 33,088,000 | 687,457 | 2.077 |
| 1941 | 47,471,000 | 493,706 | 1.040 |

The eight companies that filed income tax returns for all 4 base period years (without implying that all were in full operation during each of the 4 years) were: Talon, Conmar Products Corporation, the G. E. Prentice Manufacturing Co., Waldes-Kohinoor, Inc., Stronghold Fastener Co., Inc., Swan Fastener Corporation, Ideal Fastener Corporation, and Crown.

In addition to the competition from imported zippers during the base period, the industry was subject to a great deal of competition from other closing devices such as buttons, hooks and eyes, snap fasteners, buckles, and laces. Zippers were more costly than these

other types of closing devices, which sold at prices that the zipper industry could not afford to meet.

During the base period Crown regularly maintained certain records to reflect production at its Warren plant. These records were kept under five different classifications, two by the production planning department and three by the cost accounting department. The two records kept by the production planning department showed the production of chain by the chain-casting machines in 1,000 double inches of good castings and the production of finished zippers in units of 1,000 good finished zippers. The three records kept by the cost accounting department showed good castings in 1,000 double inches, good finished zippers in units of 1,000, and the standard cost of production at the factory excluding fixed charges. These records constituted Crown's production records during the years 1937 to 1941, inclusive. These records in units of 1,000 double inches of good chain castings ignored the various lengths of zippers ($4\frac{1}{2}''$ to $50''$) the sliders and other parts requisite for a completed zipper, the plating and enameling costs, separable and nonseparable zippers, and metal and plastic zippers. Similarly, these records in terms of 1,000 units of good finished zippers ignored the various lengths, lumped together separable and nonseparable zippers and plastic and metal zippers.

Crown's books were regularly kept on a modern standard cost system. Production costs were broken down into two classes: (1) Variable costs and (2) fixed costs. Similarly, sales costs were broken down into (1) variable costs of sales and (2) fixed costs of sales. Standard variable costs of production consisted of wages, direct and indirect, material of all kinds, power, chemicals and enamel that might be consumed, and various other cost elements that varied directly with the volume of production that passed through the plant.

Crown's production for the years 1937 to 1940, inclusive, and for the first 6 months of 1941 under each of the five classifications aforementioned was as follows:

| Production planning department | | | Cost accounting department | | |
|---|---|---|---|---|---|
| Year | Double inches (000) | Zippers (000) | Double inches (000) | Zippers (000) | Dollars |
| 1937 | (¹) | (¹) | 63, 561 | 4, 715 | $314, 180 |
| 1938 | 148, 779 | (¹) | 149, 125 | 11, 340 | 722, 443 |
| 1939 | 197, 513 | 15, 698 | 196, 884 | 15, 863 | 1, 032, 794 |
| 1940 | 251, 268 | 23, 155 | 250, 750 | ² 24, 832 | 1, 370, 309 |
| 1/1 to 6/30, 1941 | 151, 257 | 14, 529 | 159, 640 | (¹) | ³ 827, 083 |

¹ Not available.
² August figures not available; included on estimated basis.
³ Standards changed Jan. 1, 1941. Figure shown is an adjusted figure to place on same basis as other years.

The dollar amounts above do not take into account differences or variances between Crown's standard variable costs and its actual costs of production. Exhibit 77, a monthly schedule of Crown's standard variable costs of production, 1937 through June 30, 1941, is incorporated herein and made a part hereof by this reference.

Measured in terms of standard variable costs, Crown's production of zippers increased steadily during the period July 1, 1937, to December 31, 1940. Its average weekly costs in July 1937 were $5,330; in December 1940 its average weekly costs were $28,719, with the high for the period, $32,000, occurring in October 1940. After adjusting the first 6 months of 1941 to the same standard variable cost basis as the previous period, Crown's weekly average increased to a high of $34,067 in May 1941.

For the period 1936 to 1941, inclusive, Crown's unit sales plus the net increase in its inventory at the end of the year indicated total unit production as follows:

| Year | Unit sales | Increase | Inventory end of year | Increase | Production | Increase | Prod. in inventory |
|------|-----------|----------|-----------------------|----------|------------|----------|--------------------|
|      |           | Per cent |                       | Per cent |            | Per cent |                    |
| 1936 | 909,740   |          |                       |          | 909,740    |          |                    |
| 1937 | 2,707,000 | 198      | 2,500,000             |          | 5,207,000  | 472      | 48                 |
| 1938 | 7,267,923 | 168      | 5,392,876             | 116      | 10,160,799 | 95       | 28                 |
| 1939 | 11,266,534| 55       | 8,783,788             | 63       | 14,657,446 | 44       | 13                 |
| 1940 | 19,549,534| 74       | [1]10,850,334         | 24       | 21,616,080 | 47       | 10                 |
| 1941 | 29,079,362| 49       | [2]                   |          | [2]        |          | [2]                |

[1] Estimated by taking increase for first 6 months of 1940 and multiplying by 2.
[2] Not available.

At January 1, 1936, Crown's fixed assets totaled $36,852.86, and its reserve for depreciation was $3,750.02, giving a net balance of $33,102.84. During each of the base period years Crown made substantial additions to its fixed assets, particularly machinery and equipment, and during these years it depreciated, disposed of, and charged off various fixed assets, with the result that, on December 31, 1939, its fixed assets aggregated $575,387.69, its reserve for depreciation amounted to $117,229.79, and the net balance of its fixed assets was $458,157.90. The details with respect to the increase in Crown's fixed assets during the base period years are contained in Exhibit 46 which is incorporated herein by reference.

Late in 1938 Crown's management anticipated the need of additional capital. A proposal was submitted to the directors to amend the corporate charter and create a new class of $10 par second preferred stock convertible into common on a share for share basis. On or about December 21, 1938, Crown's charter was so amended and 126,000 shares of second preferred stock was authorized to be issued. On December 29, 1938, Crown authorized the issuance of 35,000 shares of second preferred to meet its need for $350,000 of additional capital. Common

stockholders were authorized to subscribe for seven-tenths of a share of second preferred for each share of common, the subscription price to be paid by January 30, 1939.

At a meeting of Crown's executive committee on June 21, 1939, Hutton presented a statement prepared by the Finance and Control Division which estimated profits based on sales of $3 million and also showing the effect of a 10 per cent reduction in selling prices. The executive committee approved at this meeting the purchase of 15 air-operated metal chain-casting machines, heretofore mentioned. The executive committee was advised at this meeting that additional capital would be required in the near future and the issuance of additional second preferred stock was discussed, but action was deferred until a later meeting.

The minutes of Crown's executive committee meeting on August 2, 1939, contained the following minutes with respect to Crown's need of additional capital:

2. *Capitalization.* The Treasurer [Hutton] reported that in view of the present expansion program, it would be necessary for the company to secure additional working capital to finance its operations.

After discussion it was decided to recommend to the Board of Directors that, whereas the Corporation is now authorized to issue 126,000 shares of 2nd Preferred Stock of the par value of $10.00 per share, of which only 35,000 have been issued, it now issue 60,000 additional shares of the authorized 2nd Preferred Stock in the amount of $600,000, and that the same be offered for sale to the Common stockholders at par, the funds secured from the sale to be used as follows:—

1. Liquidate the present bank loan
2. Furnish capital to finance the expansion program now under way, and
3. Provide funds to finance normal operations.

The executive committee fixed August 10, 1939, for a special meeting of Crown's board of directors to act on the issuance and sale of additional second preferred stock. On August 10, 1939, Crown's board of directors authorized the issuance of 60,000 shares of second preferred stock for $600,000. Each common stockholder was entitled to subscribe to 1.2 shares of second preferred for each share of common, the subscription price to be paid by September 12, 1939.

In connection with Crown's need for additional capital and in preparing the plans for its expanded business, Crown's officers, who were also members of the Central Control Department of the Finance and Control Division of the Coats & Clark organization, prepared a brochure entitled "Crown Fastener Corporation—Estimates & Comparisons." These estimates and comparisons were prepared over a period of weeks and were dated June 14, 16, 27, 28, 30, July 10 and 11, 1939. The document included estimates of the additional cash requirements of Crown, $300,000 for amounts owed banks and $297,000 for additional disbursements to December 31, 1939, including the cost of

the 15 new air-operated machines that had been ordered as afore-mentioned. It was concluded:

The estimated [capital] requirements also take into consideration any profits that may be earned in 1939. We consider that $600,000 additional capital is the minimum that should be put into the business if sales continue to increase in line with our expectations, because such increased sales will call for larger inventories and a heavier investment in Accounts Receivable and related items.

It was standard procedure in the Coats & Clark organization to make estimates of the profit that would be earned upon increases or decreases in sales by its various companies. The books and records provided the information which enabled management to compute such items as variable costs of sales, marginal balance at the mill, variable selling expense, net marginal balance, manufacturing fixed charges, direct selling expense, etc. At the meeting of Crown's executive committee on August 2, 1939, Hutton submitted a revised estimate of income, profit and loss for a 12-month period upon instructions from the executive committee. This estimate, dated June 16, 1939, arrived at approximately the same estimated profit as a previous estimate dated June 29, 1938, although "material changes have occurred since the preparation of" the June 29, 1938, plan. Hutton informed the executive committee that the three most important of the "material changes" that had occurred were as follows:

(1) Selling prices were reduced by approximately 10% and to obtain $3,000,000 of sales at the lower prices approximately 2,000,000 additional fasteners would have to be sold.

(2) Under Plan VI [the June 29, 1938, plan] the sales estimate was $2,250,000 for Industrial Fasteners and $750,000 for Domestic Fasteners. In the recent statement the distribution is $1,500,000 for Industrial and $1,500,000 for Domestic.

(3) Plan VI [1938 plan] called for approximately 10% of sales to be Plastic Fasteners. In the latest estimate no consideration had been given to the Plastic business—the $3,000,000 sales consist entirely of Metal Fasteners. In addition the replacing of the 10% Plastic sales by Metal Fasteners calls for a substantial increase in unit sales in order to maintain sales at the $3,000,000 level.

Before estimating sales in 1939, Hutton conferred with the Sales Department as to what level of sales they could achieve. After agreeing with Sales on a figure of $3 million, allocated equally between industrial and domestic sales, Hutton ascertained from Production Planning Department that the plant had the capacity to achieve this level of sales over a 12-month period with the new machinery on hand plus changes to the existing machinery. This was routine procedure in the Coats & Clark companies and was followed by Hutton in making the June 16, 1939, estimate.

For the years 1935 to 1941, inclusive, Crown's net sales (dollars), gross profit, net profit and ratio thereof to net sales were as follows:

| Year | Net sales | Gross profit | Net profit | Ratio to net sales | |
|---|---|---|---|---|---|
| | | | | Gross profit | Net profit |
| 1935 | $42,121.57 | $6,077.32 | | 14.43 | |
| 1936 | 90,973.43 | 9,292.05 | ($76,266.47) | 10.21 | |
| 1937 | 329,886.20 | 85,604.40 | (47,830.08) | 25.95 | |
| 1938 | 917,452.73 | 327,755.99 | 18,607.81 | 35.72 | 2.02 |
| 1939 | 1,504,163.49 | 580,668.90 | 101,670.43 | 38.60 | 6.76 |
| 1940 | 2,245,930.09 | 890,282.73 | 195,376.99 | 39.60 | 8.70 |
| 1941 | 3,403,033.89 | 1,204,345.96 | 276,536.79 | 35.39 | 8.13 |

Crown's gross sales, domestic and industrial, for the years 1939, 1940, and 1941, as shown by its ledger and total sales as shown by its tax returns, were as follows:

| Year | Domestic | Industrial | Total sales | |
|---|---|---|---|---|
| | | | Ledger[1] | Tax returns |
| 1939 | $481,706.55 | $982,740.30 | $1,464,446.85 | $1,584,754.72 |
| 1940 | 712,674.06 | 1,495,928.52 | 2,208,602.58 | 2,344,856.86 |
| 1941 | 1,220,963.58 | 2,222,753.83 | 3,443,717.41 | 3,479,959.17 |

[1] Excludes sales classified on ledger as "Miscellaneous," "Job Lots," "Unfinished Goods," "Sundry," etc.

During the base period, Morin conducted various experiments seeking a way to die-cast more than one scoop at a time. He developed a method of diecasting two adjacent scoops and a method of diecasting scoops on two tapes simultaneously. Applications for patents were filed and patents were issued in connection therewith as follows:

| Application filed— | U.S. Patent No. | Date issued |
|---|---|---|
| July 16, 1937 | 2,218,091 | Oct. 15, 1940 |
| July 16, 1937 | 2,170,421 | Aug. 22, 1939 |
| Mar. 17, 1938 | 2,200,633 | May 14, 1940 |

These patents were designed to produce multiple scoops, but no further action was taken thereunder because they were not good enough. After filing the above applications, Morin continued his experiments seeking a better method of producing multiple scoops. These experiments continued through 1939 until 1941, when he developed an efficient die that could die-cast two scoops at a time instead of one. The design for this multiple scoop was conceived in 1941 and the patent was issued in 1943. In addition to increasing the production of scoops, the resulting multiple scoop zippers permitted sliders to operate in either direction which simplified assembling the zipper. During December 1941, Crown's Warren plant produced samples of these multiple scoops, which established an increased capacity of production for its chain-casting machines.

OPINION.

The question here is whether petitioner is entitled to relief from excess profits tax for the years 1941 through 1945 under the provisions of section 722. Its claim is under subparagraph (4) : That it changed the character of its business during the period and that during said base period years it was committed to a change of capacity for production or operation which was consummated sometime after the base period years.

The record does not establish that petitioner would be entitled to the commitment rule. Petitioner points to its plan completed in 1940, to build up its stock of inventory at various depots in order to service its sales better, and various changes in the efficiency of its plant operations as a result of the report submitted late in 1939 by the management consultants, Rath & Strong. These would merely indicate a more efficient plant operation and more effective sales effort, not a change in "capacity." *Newburgh Transfer, Inc.*, 17 T.C. 841.

Petitioner also argues a commitment to expand its capacity is shown by its early efforts to die-cast more than one scoop at a time, continued throughout the base period years and completed in 1941. The record merely shows that Morin, who had been retained by Crown in 1934, continued experimental and development work during the base period on a way to die-cast more than one scoop at a time; that three patents were obtained in 1937 and 1938 which proved unsatisfactory; and that experiments continued until 1941 when an efficient die was developed that could die-cast two scoops at a time. This merely evidences a commitment to a general research and development plan that resulted in success in 1941. It does not show a commitment in earlier years for the installation of the multiple scoop prior to January 1, 1940.

Petitioner's last argument for the commitment rule seems to be based upon its change of all of its machines to air operation. The evidence shows, and we have found as a fact, that by the end of 1939 practically all of Crown's machines had been converted to or were new compressed air machines. This is not a commitment to a course of action for a change in capacity sometime after the end of the base period.

However, respondent admits on brief that the change in the management of petitioner's business in August of 1936, when it was taken over by the Coats & Clark interests, was a change in the character of its business within the meaning of subparagraph (4). But we are inclined to agree with respondent that the evidence does not show petitioner is entitled to the 2-year push-back rule. We are not convinced that Crown did not reach before the end of the base period the level of earnings resulting from the changes in the character of its business. Petitioner's contention that it did not is based on arguments that

the zipper market was growing, and Crown was growing faster than its competitors in the industry during the base period. The question is not whether Crown was growing in sales faster than its competitors in the industry but whether Crown had reached by the end of the base period the level of earnings resulting from the changes in the character of its business. Cf. *Suburban Transportation System*, 14 T.C. 823.

But even assuming Crown would be entitled to use the push-back rule we hold Crown has failed to establish a fair and just amount representing normal base period earnings for the changed business. The burden was on petitioner and no relief under the said statute can be given unless it shows a sufficient amount of constructive average base period net income that will produce a credit in excess of the credits which it has received under the invested capital method.

Crown begins its computation of a constructive average base period net income by estimating its 1939 sales, with the aid of the "push-back" rule, as $3,600,000. It bases this amount on separate estimates given by an independent market analyst and by Frank Hutton, one of the former executives of the Coats & Clark organization and head of its Finance and Control Division. Hutton's estimate appears to be based upon a prior estimate which had been submitted by the Finance and Control Division to Crown's board of directors in August 1939. This prior estimate appeared in a brochure entitled "Estimates & Comparisons" and dated July 11, 1939. It was presented to Crown's board of directors in connection with the Finance and Control Division's recommendation that Crown would require additional capital. In preparing the brochure, Hutton testified that he "approached the Sales Department [Crown's] and discussed matters with them and obtained from them what level of sales they thought they could achieve, providing we had the fifteen additional machines that we had approved the purchase of, and providing that we had changed over their other machines and had a capacity to take care of what they estimated we would be able to sell."[2] The estimated sales figure reached after discussion was $3 million, composed of industrial sales and domestic sales in equal portions. Hutton further testified that this sales estimate covered a period from "July, 1940 to June 30, 1941." Subsequently, Hutton was asked to prepare a sales estimate in connection with Crown's claim for section 722(b)(4) relief, taking into account the 2-year "push-back" rule, and for this purpose, he added an additional $600,000 of sales to the $3 million of estimated sales mentioned above. Thus the $3,600,000 figure has all the weakness of the original estimate of 1939 on which it was based.

---

[2] The 15 new chain-casting machines were actually acquired in 1939. Also, we have made a finding of fact that by the end of 1939 practically all of Crown's machines had been converted to or were new compressed air machines.

Petitioner's other witness also arrived at the $3,600,000 figure of estimated sales by the end of the base period. This witness testified that his sales estimate was "a figure obtained from a graphical projection based on the net sales [of Crown] for the four years 1936 to 1939 inclusive. The $3,600,000 is read off the midpoint plotted for the year 1939, Plus 2." The witness described this type of "graphical projection" as one "used both by business managers, by statisticians, by economists and by others who have to do with the forecasting of sales * * *." The graph itself is called a projection of dollar sales trend.

This projection method of estimating the sales level is clearly incorrect. In *Southern California Edison Co.*, 19 T.C. 935, the taxpayer was committed by the end of the base period to make a change in the character of its business, and it argued that in commitment cases a projection was to be made, as of the end of the base period, of the additional earnings that it might expect in the subsequent years from the increased capacity for which it had committed itself. We rejected this approach and said at page 985:

We agree with respondent that there is no statutory justification for petitioner's "projective type mechanism," and that it is indeed contrary to the general framework and purpose of the statute. Certainly, in noncommitment (b) (4) cases it is clear that where increased capacity is the basis for relief the pivotal inquiry is whether such increased capacity would have resulted in increased earnings during the base period. Cf. *National Grinding Wheel Co.*, 8 T.C. 1278; *Green Spring Dairy, Inc.*, 18 T.C. 217; *Schneider's Modern Bakery, Inc.*, 19 T.C. 763. And we have applied the same test where the increase in capacity was attributable to a (b)(4) commitment. *Studio Theatre Inc.*, 18 T.C. 548, 567.

Moreover, in noncommitment cases such as this one, the statute itself provides that "In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, * * *." It is quite obvious that Crown's projection method of estimating sales violates this statutory prohibition.

Additional reasons exist that compel us to reject Crown's estimate of $3,600,000 in sales by the end of the base period. The total net sales in dollars of the eight zipper manufacturers (including Crown) whose combined sales dominated the industry was $29,510,000 in the year 1939. The estimated sales figure of $3,600,000 would be 12.2 per cent of the total industry sales. Crown's actual sales in 1939 were $1,504,000, or only 5.1 per cent of the industry sales. There is nothing in the record to show that Crown, which had 5.1 per cent of the zipper market after nearly 6 years in the business, would have been able to capture 12.2 per cent of the 1939 market if it had changed the character of its business in 1934 instead of 1936. An-

other comparison, based on the number of units, will also demonstrate the unreasonableness of Crown's estimated 1939 sales figure of $3,600,000. Petitioner's average selling price per unit in 1939 was $0.134 ($1,504,163 divided by 11,266,534 sales). Thus it would be necessary for Crown to sell about 26,865,000 units ($3,600,000 divided by $0.134) in 1939 to realize a sales volume of $3,600,000. Since the zipper industry in 1939 sold 300 million units, it means that Crown would need about 8.9 per cent of the total 1939 zipper market to support its estimated sales volume. (26,865,000 divided by 300 million.) Actually, Crown's unit sales in 1939 were only 3.8 per cent of the total 1939 zipper market (11,266,534 divided by 300 million). Again, there is nothing in the record to show that Crown, with an additional 2 years of experience, would be able to obtain such an appreciably larger share of the 1939 zipper market.

Crown's computation of the estimated net profits that would be derived from sales of $3,600,000 is equally faulty. Hutton testified that the net profit would be $754,800, or about 21 per cent of the estimated sales. Crown then explains on brief that since this percentage rate was "in excess of petitioner's profit in 1941, we adjusted petitioner's profit to 19.5 % of net sales, or $686,790." Crown then concludes in its brief that this "same amount, i.e., $686,790. represents the constructive average base period net income for the purposes of § 722." In its reply brief Crown states that it "has shown that a fair figure for its base period net earnings was at least $702,000."

No purpose would be served to outline the steps taken by Crown to compute these two different figures for its constructive average base period net income. It is enough to point out the more serious errors in the computation. It is obvious that the net profit estimate inherits all the fatal weaknesses, outlined above, of the estimated 1939 sales figure of $3,600,000.

Crown is also mistaken when it adopts the estimated 1939 net earnings figure ($686,790) as the constructive average base period net income. As this Court said in *Del Mar Turf Club*, 16 T.C. 749, 766, when a taxpayer has once established its level of earnings under the "push-back" rule, this "assumed figure is then used as a point of departure in reconstructing the taxpayer's average base period net income (using appropriate indices based on national income, State income, industry experience, corporate profits, etc.) in order to determine his excess profits credit * * *." A taxpayer may use its 1939 reconstructed earnings for the base period average "only where the lack of significant variation is clearly established." *Midvale Co.*, 19 T.C. 1216. It is more typical to expect variations over the base period years. Not only has Crown failed to show a lack of significant variation over the base period years but an examination of its net

136

sales and net profits, as well as all the other pertinent information in the record, amply demonstrates such variations. Crown's net sales in 1936 through 1939 were $90,973, $329,886, $917,453, and $1,504,163, respectively, while its net profits (or losses) for the same years were ($76,266), ($47,830), $18,608, and $101,670. Crown's unit sales over the base period years ranged from 909,740 to 11,266,534. The variations are obvious.

Crown also ignores, in its reconstruction, the marked decrease from foreign competition in zipper sales toward the end of the base period. We have outlined the reasons for this decreased foreign competition in our findings of fact and need not repeat them here, except to point out that total imports dropped from 43,728,807 units in 1938 to 32,349,220 in 1939, and that the percentage of total foreign imports to total domestic sales in 1937 through 1939 was 28.3, 21.6, and 10.7, respectively. This naturally increased the markets available to domestic zipper manufacturers. But the benefit of these changes was felt only toward the end of the base period and Crown, by maintaining that its earnings level remained constant over the whole base period, is spreading the benefit of such changes over all the base period years.

Crown has not established a fair and just amount representing normal base period earnings for its changed business. In reaching this conclusion we have also considered Crown's claim for excess profits tax relief because of a change in ratio of nonborrowed capital to total capital.

We hold that petitioner is not entitled to excess profits tax relief under section 722(b)(4).

Reviewed by the Special Division.

*Decision will be entered for the respondent.*